## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

In re

**RICHARD PAUL LEWIS,** and
**MELISSA LYNN LEWIS**,

        Debtors.

Case No.  **06-60684-7**

---

**WAYNE PATRICK** and **ROCKY
MOUNTAIN ROCK, INC.**,

        Plaintiffs.

-vs-

**RICHARD PAUL LEWIS** and **MELISSA
LYNN LEWIS**,

        Defendants.

Adv No.  **07-00016**

## MEMORANDUM  OF  DECISION

At Butte in said District this 28th day of December, 2007.

Pending in this adversary proceeding are Counts I and II of the Plaintiffs' complaint

objecting to the Defendants/Debtors' discharge under 11 U.S.C. § 727(a)(4)(A) for fraud,

material omissions and false oaths.  Trial of this adversary proceeding was held after due notice

on September 27, 2007.  Plaintiffs were represented by attorney James H. Cossitt ("Cossitt") of

Kalispell, Montana.  Defendants/Debtors Richard Paul Lewis ("Richard") and Melissa Lynn

Lewis ("Melissa") both appeared and testified, represented by attorney Jon R. Binney ("Binney")

of Missoula, Montana.  Also testifying were the panel Chapter 7 Trustee Richard J. Samson

1

("Samson"), Debtors' bankruptcy attorney M. Penny Leatzow ("Leatzow"), and Melissa's brother Jeffery Engle ("Engle"). Plaintiffs' Exhibits ("Ex.") 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 21, 23, 24, 25, 26, and Defendants' Ex. A[1], B, C, D, and E were admitted into evidence. At the conclusion of the parties' cases-in-chief the Court granted the parties time to file briefs, which have been filed and reviewed by the Court, together with the record and applicable law. The pending Counts I and II are ready for decision.

This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b). Counts I and II of Plaintiffs' complaint objecting to Defendants' discharge are core proceedings under 28 U.S.C. § 157(b)(2)(J). For the reasons set forth below, at the conclusion of the trial and decision of the remaining Counts III and IV of the complaint, the Court will enter judgment for the Defendants dismissing Counts I and II of Plaintiffs' complaint based upon § 727(a)(4)(A). This Memorandum of Decision includes the Court's findings of fact and conclusions of law under F.R.B.P. 7052.

## FACTS

The Final Pretrial Order approved by the Court on September 21, 2007, sets forth the following agreed facts:

  a. Debtors were shareholders and officers of Rocky Mountain Rock, Inc. (hereinafter "Rocky Mountain Rock");

  b. Debtors were shareholders and officers of Lewis Land Management, Inc.;

  c. Lewis Land Management was a DBA of Defendants;

---

[1]Ex. 2 and A both are copies of Defendants' petition, Schedules and Statements, except that Leatzow testified that Ex. A is incomplete, and missing additional documents setting forth inventory.

d.  Lewis Land Management, Inc., was incorporated on February 15, 2006;

e.  Melissa Lewis was the registered agent of Lewis Land Management when it incorporated;

f.  Richard Paul Lewis was the registered agent for Rocky Mountain Rock;

g.  Richard Paul Lewis was the incorporator of Rocky Mountain Rock.

Additional facts are developed from the testimony and exhibits.

Richard has worked as a construction equipment operator, in logging and land clearing. He currently is seasonally employed as an equipment operator for Sandry Construction. Ex. 1, p. 41. Melissa is a stay at home mother and spouse. Defendants have three children.

Richard admitted that he has a conviction for felony theft[2]. He testified that he hurt his knee while intoxicated[3] for which he submitted a claim for workers compensation benefits as a work-related injury, was later questioned and admitted that he lied about his injury. Ex. 1, p. 43; Ex. 24. The Court allowed the testimony regarding Richard's conviction and Ex. 18, 24, 25, and 26, overruling Defendants' objection.

Melissa testified that Lewis Land Management was started in June of 2005 as a sole proprietorship and conducted business operations and had economic activity in 2006. She did not know how much economic activity occurred except that she and Richard incurred credit debts. Ex. 5 is a business entity search printout from the Montana Secretary of State dated

---

[2]Richard served no jail time. He received a deferred sentence and probation for the crime on January 27, 2005, plus a fine and order to pay restitution to the State Fund in the amount of $27,995.00. Ex. 18.

[3]Richard injured his knee while sumo wrestling at the "Barstool Races" event at the Packer's Roost Bar in Coram, Montana. Ex. 24, p. 3.

2/12/2007, indicating Lewis Land Management was a business name filed 6/16/2005, engaged in logging and brush removal, of inactive status by reason of cancellation.

Richard testified that he was involved in the operations of Lewis Land Management but not with its books, for which he relied on Melissa.  Melissa testified that she operated the bookkeeping program "Quickbooks", but added that "I don't have clue one about Quickbooks." Ex. 1, pp. 75, 77.  Melissa testified that she tried to incorporate Lewis Land Management in November of 2005, but that she messed it up.  She called her accountant Bryan Gilbertson who told her he would take care of it when she brought in her taxes, and he incorporated Lewis Land Management on 2/15/06.  Ex. 4.   She testified she was not aware of signing documents incorporating Lewis Land Management, and that it did not even last a month in operations after incorporating because there was no longer any logging.  Ex. 4 is a business entity search printout from the Montana Secretary of State, dated 2/12/2007, which lists Lewis Land Management Inc. as a corporation in good standing[4], active status, incorporated February 15, 2006, and names Melissa as agent.  Richard testified that Lewis Land Management, Inc., was dissolved in 2006 or 2007, but that it conducted business near the end of 2006.  Melissa testified that Lewis Land Management, Inc., ceased operations in March of 2006.  Ex. 1, pp. 21-22.

Rocky Mountain Rock was a business engaged in quarrying stone, and formed when Defendants and another person identified as Ron Schroeder saw a business opportunity.  Rocky Mountain Rock was incorporated in 2002.  Ex. 6 is a printout of a business entity search from the Montana Secretary of State dated 9/11/2007, identifying Rocky Mountain Rock as a close

---

[4]Defendants' answers to Plaintiffs' Interrogatories Nos. 7 and 10 state that Lewis Land Management, Inc., will involuntarily dissolve shortly.  Ex. 7, pp. 3, 4.

corporation incorporated 1/29/2002, naming Richard as registered agent, and stating that the corporation was involuntarily dissolved and of inactive status since 12/4/2006.  Defendants have a black vinyl corporate minute book for Rocky Mountain Rock with respect to which Melissa testified:  "There's nothing that I understand in it."  Ex. 1, p. 14: 2-13.

Richard testified that their partner in Rocky Mountain Rock surrendered his shares and left in 2004.  Defendants are not good at bookkeeping and needed help.  Defendants are members of the Cornerstone Church of God, where they met Plaintiff Wayne Patrick ("Patrick").  Patrick invested money in Rocky Mountain Rock in an amount estimated at $20,000.  Melissa testified that Patrick became an owner and officer of Rocky Mountain Rock until she received a letter of resignation from Patrick.  In the Fall of 2005 Patrick moved back to California and no longer was regularly involved in the business of Rocky Mountain Rock.

Melissa testified at the Rule 2004 examination that the Defendants paid themselves by owner draws from Rocky Mountain Rock before Patrick came along.  Ex. 1, p. 77.  Melissa testified that their accountant advised them they could borrow funds from Rocky Mountain Rock, and they did on their own authority.  Ex. 1, pp. 79, 82.  Defendants' answers to interrogatories 11 and 12 state that Patrick consented to their withdrawals from Rocky Mountain Rock, Ex. 7, p. 5, and no evidence exists in the record to the contrary so those answers are uncontroverted.

Richard testified that he used his personal credit to purchase goods and services for both Rocky Mountain Rock, and for Lewis Land Management, including purchasing equipment.  Richard could not identify the names of any lines of credit he opened for Lewis Land Management's operations  He testified he opened a personal line of credit with Chrysler Financial in his name to purchase a truck to haul stones for Rocky Mountain Rock's operations.

5

Ex. 21 is an invoice from Whalen Tire in Kalispell and other bills.  Richard testified that

some bills were to Rocky Mountain Rock, and some were for him personally.  Richard's name

does not appear on the Whalen Tire bills.  Page 21b of Ex. 21 is an Allied Explosives bill to

Rocky Mountain Rock, which Richard stated covered blasting.  Page 21c was a bill from NCO

Financial Systems to Rocky Mountain Rock.  Page 21c is a letter from ABC Collectors, Inc., to

Rocky Mountain Rock, which Richard testified was a Rocky Mountain Rock debt.

Ex. 22 is a printout of accounts for Glacier Forest Products Inc., a sawmill which was

owned by persons including Melissa's brother,[5] Engle.  Engle testified that he is vice president of

Glacier Forest Products, Inc., which purchased logs from Lewis Land Management from 2005 to

2006, paying cash in an amount he could not remember until he reviewed Ex. 22, after which he

estimated the amount at $6,000 or $7,000.  Richard testified that Glacier Forest Products Inc., did

business with Lewis Land Management, Inc., but he did not know if 2006 income for Lewis Land

Management, Inc., was included in Debtors' bankruptcy Schedules.  He testified that his

Statement of Financial Affairs ("SOFA"), Question 1 regarding income, did not include income

from Lewis Land Management, Inc., and he did not know why.  Melissa identified Ex. 12 as

---

[5]Engle reviewed Ex. 22 and described it as a printout he produced at Cossitt's request and shows payments to Lewis Land Management, Inc.  Defendants' objected to Ex. 22 on the grounds it is outside the scope of the complaint and the Final Pretrial Order.  Cossitt admitted that Ex. 22 does not adhere to the complaint but argued it shows failure to disclose and would be appropriate to amend the pleadings to conform to the evidence.  The Court sustained Defendants' objection and refused to admit Ex. 22.  Cossitt moved to reconsider, which the Court denied.  Rule 15(b),  Fed. R. Civ. P. (applicable in adversary proceedings under F.R.B.P. 7015) provides for amendments to conform to the evidence and states in pertinent part:  "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."  Defendants did not consent.

showing their income from December through May from Lewis Land Management[6], and testified

that after March 31, 2006, the Exhibit reflected income from Sandry Construction, where

Richard testified he went to work for wages.  Richard testified that after he went to work for

Sandry Construction he no longer worked for Lewis Land Management.

Richard testified that Rocky Mountain Rock ran out of sales of rock beginning in the

summer of 2005.  Melissa testified the Rocky Mountain Rock quit operations in March of 2005,

leaving unpaid bills and assets.  Defendants had been given a guarantee by a company identified

as Montana Stone and that it would purchase rock from Rocky Mountain Rock.  Richard testified

that Montana Stone reneged on the order in late 2005 and they had no more business.  Rocky

Mountain Rock could not work and had no sales, so it ceased operations.  Richard testified that

Patrick took the equipment's business and they no longer had the means to quarry stone.  Melissa

testified that Patrick took the corporation's computer.  Ex. 1, pp. 106-07.

Melissa testified that Rocky Mountain Rock was dissolved as nothing was left, but that

Defendants took no actions to personally dissolve it.  Ex. 1, p. 33.  She testified that she called

the state and was told that if they quit doing business the corporation would dissolve, but they did

not file articles of dissolution or do anything to terminate their stock ownership interests.  Ex. 1,

pp. 33-34.  Ex. 6 shows Rocky Mountain Rock was dissolved 12/4/2006[7].

Melissa testified that they felt personally responsible for the debts of Rocky Mountain

Rock and that they used their personal credit and sold their personal assets to pay bills of Rocky

---

[6]The Court admitted Ex. 12, but noted that the Pretrial Order is specific in listing the
matters at issue in this adversary proceeding.  The Court noted that it would review the exhibits
as they relate to the specific issues stated in the Pretrial Order.

[7]The last annual report ("AR") was filed on 1/18/2005 according to Ex. 6.

Mountain Rock after it stopped operations.  The source of their understanding that they were personally responsible is shown by letter, dated April 17, 2006, Ex. C, wherein Patrick's attorney Michael Ferrington demanded $46,115.59 in lease payments from the Defendants.  Patrick's attorney also in Ex. C accused Defendants of commingling assets of Rocky Mountain Rock, and states, "it appears that you have personal liability for the debts of the corporation . . . ."  Melissa testified that Ex. C formed her and Richard's understanding that they were personally responsible for Rocky Mountain Rock's corporate debt.  No evidence was offered by Plaintiffs to controvert Ex. C, and Plaintiffs did not object to its admission.

Richard and Melissa had debts and no way to pay them, including Rocky Mountain Rock loans, and they decided to file for bankruptcy protection because creditors were hounding them. They went to see attorney Leatzow in Kalispell in the beginning of 2006.  Melissa testified that when they went to see Leatzow, Rocky Mountain Rock was no longer operating.  She testified that she provided Leatzow with the corporate records and black minute book for Rocky Mountain Rock, and disclosed its debts to her.  Ex. 1, p. 35

Leatzow is a licensed attorney in the State of Montana, and has practiced bankruptcy for a number of years.  Leatzow testified that she met with Defendants numerous times over a period of 4 to 6 weeks before filing their bankruptcy petition.  She testified that she typically provides clients with a checklist and goes through a series of questions with clients, enters their information into the bankruptcy software, and sends clients a letter for any additional information she believes is lacking.  Ex. 10 is Leatzow's questionnaire or "Client Information Worksheets" she gave Defendants to fill out.  She testified that clients such as Defendants must sit down with her and go through Ex. 10 step by step.  Ex. 11 is Leatzow's bankruptcy checklist.  She testified

8

that the checkmarks next to items listed on Ex. 11 indicate that she received those items from the clients.

Cossitt cross examined Leatzow about what he relies on for guidance with respect to disclosure of assets, and her understanding of case law construing § 727(a)(4). Leatzow summarized her understanding of the case law that debtors must disclose assets and their values to the best of their ability.

Leatzow sent Defendants a letter dated, May 29, 2006, Ex. D, requesting additional information for questions she had, including information regarding both corporations, assets, liabilities and income[8]. Melissa testified that she disclosed to Leatzow that Lewis Land Management conducted business operations and had economic activity in 2006. Ex. E is Melissa's handwritten note to Leatzow in response to her questions on Ex. D. Leatzow testified that Ex. E is responsive to her questions from Ex. D, and that Defendants were very cooperative and provided everything she asked for.

Melissa's response to Question 1 on Ex. E states that Lewis Land Management was a logging company they began in June 2005 and stopped in March of 2006. Leatzow testified that she never saw documentation regarding Lewis Land Management, Inc. Leatzow testified that it was her understanding that someone filed the articles incorporating Lewis Land Management, Inc., after it had ceased operations, and that when they came into see her Rocky Mountain Rock had ceased operations. Melissa confirmed that Lewis Land Management, Inc., had ceased operations and had no assets at the time Defendants filed their bankruptcy petition.

Melissa identified Ex. 13 as her description of what their checks were written for, and

---

[8]The handwriting on Ex. D is Leatzow's, from the time she spoke to the Defendants.

disposition of their 1999 Pontiac Grand Am, boat and house.  Melissa identified Ex. 14 as

Debtors' response to Leatzow's questions.  Ex. 12, 13, and 14 are in Melissa's handwriting.

Melissa identified Ex. 17 is a statement for Lewis Land Management and R. Paul Lewis

Account dated 6/2/06.  At first Melissa could not reflect Ex. 12's income to Ex. 17, but she later

identified entries of $200 and $400, dated 12/23/05 and 12/28/05 are reflected on both Ex. 12

and Ex. 17, as income to her.  She testified that Ex. 12 is from "personal account", and do not

correspond with the deposits and payments reflected on Ex. 17.  She testified that Ex. 17 is Lewis

Land Management's business account register.  Deposits on Ex. 17 of $1,198.05, $689.50,

$1,379.10, $3,262.87, $320.00, $592.00, $743.50, $636.20, $6,872.55, $161.00, $125.75, and

$500.00 are shown, and Melissa testified she assumed the $6872.55 deposit and all others had to

be income from sale of logs.  On April 13, 2006, deposits of $500 were made into the Lewis

Land Management, and Melissa agreed on cross examination that Lewis Land Management was

still conducting business at that time.  The account on Ex. 17 was closed on 5/11/06, and the last

entry is dated 5/12/06.  Melissa agreed that all deposits on Ex. 17 were business income.

Leatzow testified she did not recall whether Defendants disclosed approximately $15,000 in

business income for Lewis Land Management in 2006.

On August 17, 2006, Defendants signed a verification that they disclosed all their assets,

income and bills of any kind, and that they understand they are subject to federal investigation

and prosecution if found not to have provided all necessary information.  Ex. 23.  Richard and

Melissa filed a joint voluntary Chapter 7 petition, Schedules, SOFA and other documents

prepared by Leatzow on August 21, 2006.  Both Defendants testified that they signed their

petition, Schedules and Statements declaring under penalty of perjury that they were true,

10

complete and accurate to the best of their knowledge.  Both Debtors testified that they read the Schedules and Statements and signed them affirming they were true and accurate, but Richard later testified that he did not remember signing the SOFA.  Melissa testified that she did not review the Schedules and Statements very well, "obviously", after hearing the testimony about whether the corporate debt should be listed as "codebtor".  Richard testified that, as of the petition, date Rocky Mountain Rock and Lewis Land Management, Inc., both had ceased operations and there was no value to either corporation as of that date.

The Defendants' petition lists "Rocky Mountain Rock Inc." and "Lewis Land Management" under "All Other Names used by the Debtor in the last 8 years" directly below Richard's name.  Ex. 2/A.  Leatzow testified that Defendants provided her with that information "to the best of their ability", and it was her understanding from her interviews with the Debtors and their documentation that no value existed in either corporation at the time of the bankruptcy filing.  The petition further lists, along with Richard's last four digits of his social security number, the EIN or other Tax I.D. Nos. 30-0034985 and 20-3665030.

The Schedules list no real property, and $20,514.00 in personal property.  The box on Schedule B, paragraph 13, for stocks and interests in incorporated and unincorporated businesses is marked "None."  Richard testified that he was still a stockholder of Rocky Mountain Rock and Lewis Land Management when he signed his Schedules.  Melissa testified that in August 2006 she was a stockholder in Rocky Mountain Rock, but not in Lewis Land Management because no stock was given out.  Melissa was not aware why Rocky Mountain Rock and Lewis Land Management were not disclosed at paragraph 13.  Leatzow testified that no piece of paper evidencing stock ownership existed, and she had already noted the existence of the defunct

11

corporations on the petition and SOFA.  Leatzow testified she did not list stock ownership of the two corporations on Schedule B, paragraph 13, because they were defunct.

The first debt listed on Schedule F is for Applied Explosives for $2,992.47 dated 3/29/2005 and is described as "Explosive Services" and listed as "H", or husband's debt. Richard testified that debt is his debt.  He testified he incurred that debt for Rocky Mountain Rock for services.  At his 2004 examination Richard testified that the claim was Rocky Mountain Rock's debt, and not his, and he did not now why it was listed on his Schedules.  Ex. 1, pp. 44-45, 47.  Richard testified at trial that it was his debt, and that although the bill says it was Rocky Mountain Rock's debt he thinks it is his debt because of his personal relationship with the blaster.  On Schedule F the box marked "codebtor" was not marked for the Allied Explosives debt.  Neither Richard nor Melissa knew whether Rocky Mountain Rock was liable on the Allied Explosives debt, or why it was not listed as a codebtor .  Ex. 1, pp. 46, 47.  Richard testified at trial that he understood he had no corporate protection, and that Rocky Mountain Rock's debts were his debts.

Leatzow testified that questions of ownership of the corporate assets existed, and that the documentation in the corporate black book did not correspond with what Defendants thought the ownership was.  She testified that with small corporations the individual owners usually are as liable as the corporations, and so she lists debts on bankruptcy schedules as individual debt.  She listed Defendants as owing the debts because she expected the creditors to hold the Defendants individually liable.  Leatzow testified on cross examination that she did not mark the "codebtor" box on Schedule F for the Allied Explosives debt, and for other corporate debts discussed below, because Rocky Mountain Rock did not exist anymore according to what Defendants represented

12

to her.

Schedule F lists at page 2 a debt to Chemical Toilet Rentals which Richard testified was the same as the Allied Explosives debts, i.e., he felt he was responsible for Rocky Mountain Rock's bills.  He did not check the codebtor box for the Chemical Toilet Rental debt and could not explain why.  Next Schedule F lists a debt to Chrysler Financial for which Richard testified that was his personal debt.  At the 2004 exam Richard testified that Chrysler Financial's debt was a debt of Rocky Mountain Rock's.  Ex. 1, p. 48.  Richard could not explain the discrepancy, or why the codebtor box was not marked, or why the disputed box was not checked on Schedule F.

Also on Schedule F, page 2, is a debt to City Service Valcon marked "H" for propane services.  Richard could not recall that debt.  At the 2004 examination, page 50, Richard testified that the City Service Valcon debt was for services rendered to him, and used for Rocky Mountain Rock.  At trial Richard testified that he had no corporate protection and all the debts for Rocky Mountain Rock and Lewis Land Management, Inc.'s debts were his, according to his attorney Leatzow.  He could not explain why the "H" box was checked for the City Service Valcon debt and not the "codebtor" box.  The last entry on page 2 of Schedule F lists Edgmon, Bryce Trucking Inc., listed as "H" for $1,350.64.  Richard testified that debt was a Lewis Land Management, Inc., debt, and he did not know why that debt was not marked "codebtor" instead of "H" and was not listed as disputed.

Schedule F, page 3, lists a debt to Michael A. Ferrington explained as "Legal Fees in connection with Patrick Lease" and is marked as a joint debt in unknown amount.  Schedule F, page 4, lists a debt to the MT Dept of Labor/Industry for benefits overpayment, and is marked "H".  Richard could not recall that debt at trial.

The next debt on Schedule F lists Wayne Patrick as a creditor with an unsecured nonpriority claim for "Leased Equipment", and is listed as a joint debt in the amount of $46,115.59, dated from 10/12/2004, and is the largest claim in the aggregate total of $84,614.45 in unsecured claims. Richard testified that he does not believe that he is personally liable on the equipment lease because he never read or signed a lease[9]. Ex. 1, pp. 53-54. He testified that he was led to believe by his counsel Leatzow that he had no corporate protection, and understood that the Debtors were liable for all of Rocky Mountain Rock's debt, including Wayne Patrick. He did not mark "codebtor" for Wayne Patrick's claim on advice of counsel. At the Rule 2004 examination, Page 54, Richard testified that he did not know why he did not list Wayne Patrick as a Rocky Mountain Rock debt. He could not explain the discrepancy between the Rule 2004 examination, but testified at trial that the debts were the same for himself and Rocky Mountain Rock.

Below Patrick's debt on Schedule F is a debt to SBA, marked "H" and not codebtor, in the amount of $8,685.37. Richard testified at trial that the loan was taken out in his name for Rocky Mountain Rock, and his understanding is that "it's all mine". At the Rule 2004 examination Richard testified that the SBA loan is a debt of Rocky Mountain Rock, not his individually. Ex. 1. With respect to the SBA loan Richard again testified that it was his understanding from his counsel Leatzow that he was responsible for all Rocky Mountain Rock's

---

[9]One exchange in the Rule 2004 examination, Ex. 1, p. 60: 11-14, demonstrates Richard's confusion in this process:

Question: Do you contend that the lease with Mr. Patrick was with you individually?

Richard: Yes. It was for Rocky Mountain Rock.

debt.  Richard testified he still does not know why the corporate debts were not marked as codebtor debts.  Melissa testified that she too thought they owed the debts of Rocky Mountain Rock.

Debtors filed an amended Schedule F on October 2, 2006, raising the total to $84,848.98 in unsecured claims, Ex. 8, but no amendments were filed to correct Schedule B to list Debtors' interests and status in the two corporations, or to list the corporate debts as joint debts and the corporations as codebtors.  Melissa testified that she was not aware of any discussions regarding the need for amendment to clarify corporate interests or creditor issues with respect to corporate versus personal debt.

Richard testified that he borrowed money from Rocky Mountain Rock while it was in business, in the amount of approximately $12,500 in loans, but that he did not know why Rocky Mountain Rock was not listed as a creditor in their Schedules.  Melissa testified that they borrowed money from Rocky Mountain Rock, Ex. 1, p. 67, but she did not feel that Rocky Mountain Rock was a creditor and they did not list it as a creditor in their Schedules because it was her understanding that she and Richard were Rocky Mountain Rock, and they did not list themselves as creditors.

At Schedule H – "Codebtors", Debtors listed no codebtors.  Ex. 2.  Richard could not explain why Rocky Mountain Rock was not listed as a codebtor.  Leatzow testified that no reason existed for listing the corporations as codebtors on Schedule H because she did not know whether any creditor would consider Rocky Mountain Rock a codebtor as it was defunct.

The business income and expense schedule on Ex. 2 states that Debtors had $0 income from business.  Richard did not know why the business income and expense schedule did not

15

reflect any income.

Richard testified that he did not remember signing the SOFA, although his signature is preceded by "/s/" as authorized in the Court's procedures for electronic filing provided at Mont. LBR 5005-1. The SOFA, Questions 1 and 2, relate to Debtors' income. Question 1 shows $4,053.18 in "wages to date" listed for 2006. Melissa testified that the $4,053.18 listed for 2006 includes income from operation of business, even though the 2003 entry specified the source as both wages and business interests. Richard testified that he did not know what that figure was except wages to date, and that he had no business income. For 2005 Question 1 includes $22,252.00 in wages, interest and business interests. Leatzow testified that the 2006 figure was all that Richard had informed her he had received as wages so far to the date of the petition. She testified that Richard received business income in the form of wages from Rocky Mountain Rock.

Question 2 lists $8,489.17 for 2006 described as "Net Home Sale Proceeds". Ex. 2. Richard testified that, from August 2004 to August 2006, other than employment or operation of business, he did not know if he had any income other than disclosed in Question 2. Richard testified that he sold a Bison trailer, which was in his name, to Clint Knotts but could not remember when or how much he received or what they did with the proceeds. At the Rule 2004 examination, Ex. 1, pp. 98-99, Melissa testified that the sale of the Bison trailer is in the bank statements as dated March of 2006 for $3,000. Richard did not know why the proceeds from that sale were not disclosed in Question 2 of the SOFA.

At Question 18 the SOFA asks for, among other things, "beginning and ending dates of all businesses in which the debtor was an officer, director, . . ., of a corporation . . . within the six

16

years immediately preceding the commencement of the case . . . ."  In response Defendants listed Lewis Land Mgt, I.D. No. 20-3665030, a business described as logging, from 6/1/2005 through 3/1/2006.  Richard did not know if that entry disclosed a sole proprietorship or a corporation, and he did not know why Lewis Land Management, Inc., was not disclosed.  Melissa testified that Lewis Land Management activity was listed at paragraph 18 of the SOFA.  Their response to Question 18 also lists Rocky Mountain Rock Inc., I.D. No. 30-0034985, and it is described as "rock sales" from 2/01/2002 through 3/1/2005.  Samson testified that he had that information prior to the § 341 meeting of creditors.

Melissa and Richard both testified that they reviewed their petition, Schedules and Statements before signing them.  However, at the Rule 2004 examination Richard testified that based on Cossitt's questions:  "Obviously, we didn't understand it or something.  I mean, I don't know what that piece of paper means."  Ex. 1, p. 64.  When asked whether she reviewed the Schedules before signing Melissa responded:  "Not very well, obviously, or I did not know what I was signing, if you are – You seem to be coming up with all this stuff that I really didn't know about.  No.  I mean, I assumed that we were filing bankruptcy on all of the debt that we have owed and incurred in the last how many years."  Ex. 1, p. 65.

Defendants moved in with Melissa's parents in October 2006, then moved into a trailer on her parents' land which they presently rent from them.  Ex. 1, pp. 35-26

Samson was appointed as Trustee for the above-captioned Chapter 7 case.  Samson has been panel Chapter 7 Trustee for approximately 18 years in Missoula and Kalispell.  He described his duties as including investigating debtors' financial affairs and searching for nonexempt assets to liquidate and pay creditors, and in addition reviewing cases to determine

17

whether there has been substantial abuse under the Bankruptcy Code and potential to fund a plan under Chapter 13.

Samson reviewed the petition and Schedules in the Defendants' case, and sent them a letter, Ex. 15, requesting additional information and documents in the form of a questionnaire. Samson explained that he adopted a questionnaire process after enactment of BAPCPA[10], in response to urgings from the Office of U.S. Trustee's to increase trustees' search for assets.

On August 26, 2006, Leatzow sent the Trustee a transmittal memorandum, Ex. 16, in response to and including the Trustee's questionnaire on Ex. 15.  Richard testified he did not remember signing Ex. 16 but that obviously he did sign it.  He and Leatzow testified that Richard and Melissa went through the questionnaire on Ex. 16, and that they had no assistance.  At Question 25 of Ex. 16 the question asked if they owned any shares of stock or interests in a business, and he answered "No".  Richard did not know why their response to Question 25 listed no shares or business interests.

Samson testified that in response to Question 25 of Ex. 16, in the event of a "shell" corporation he would expect an affirmative answer and a corporate tax return or a statement that the corporation is not conducting business, plus additional documents requested at Question 25. Samson testified that he could not recall any specific concerns regarding this case other than his questions about the other entities.  He described this as a relatively nondescript case.

Samson testified that it is "fairly commonplace" for individual Chapter 7 debtors to list corporate debts in their schedules, and corporate income and expenses on their schedules I and

---

[10]Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  Pub. L. 109-8.

J[11].  Samson explained that he would probably ask whether there are personal guarantees for corporate debt, and that otherwise he would object to proofs of claim filed against individuals for corporate debt.  Samson testified that when the "codebtor" box is not marked on schedules listing corporate debt, it certainly would make it more difficult to administer the case.  Samson testified that he also would expect that the boxes indicating "contingent" or "disputed" would be checked if appropriate, for adequate disclosure.

At the § 341 meeting of creditors, at which Leatzow appeared with the Defendants, Samson asked the Defendants his usual questions which he asks in all cases, and recalled from the transcript, Ex. 3, that he asked additional questions regarding the status of the corporate entities.  Richard was asked whether the Schedules were true and accurate, and answered that they were.  Samson testified that he asked the Defendants at the § 341 meeting whether the two entities Lewis Land Management, Inc., and Rocky Mountain Rock were still operating and that both Defendants responded that they were not.  Ex. 3:23-28.   Samson testified that there was nothing in his mind as a result of the § 341 meeting that made this case a "red flag."

After receiving a subpoena to testify at trial in this adversary proceeding Samson reviewed his file.  He testified that he found a reference to Lewis Land Management but not to Lewis Land Management, Inc., at Question 18[12] of SOFA which raised his concern.  Samson

---

[11]Samson testified that the Office of U.S. Trustee, rather than he, analyzes the means test to determine whether a case should be under Chapter 13.

[12]From the dates entered at Defendants' response to Question 18 of the SOFA, Ex. 2, and review of Ex. 4, 5, and 6, it may reasonably be concluded that Leatzow made a combined entry for Lewis Land Management and Lewis Land Management, Inc., in response to Question 18. The date of incorporation on Ex. 4 is 2/15/06, but the response to Question 18 states the beginning date as 6/1/2005, which could only be for the Lewis Land Management sole proprietorship.

explained that a corporate entity in which debtors own an interest may hold potential assets, which could be liquidated for payment to creditors. The Debtors' Schedules were not amended to add corporate interests, and Samson testified he did not perform additional investigation such as contacting the secretary of state's office. Instead Samson relied on the Debtors' § 341 testimony and assumed that the corporate entities were defunct and had no value. Samson filed a no asset report and asked that the case be closed and that he be discharged from office on December 4, 2006.

At trial Samson was asked his opinion whether the Debtors' failure to separately list their interests in the two corporations interfered with his administration of the estate and he responded that it did not, based on his assumption that the corporate entities were not operating as businesses. Samson testified that he did not see any assets that were worth pursuing or administering. In addition Samson testified that he did not, based on the information that he had, refer this case to the Office of U.S. Trustee for consideration of whether the filing of the case was a substantial abuse.

Patrick took the Rule 2004 examination of the Defendants on February 13, 2007. Ex. 1. Prior to that examination Richard had met with Leatzow regarding the absence of any corporate protection for the debts of Rocky Mountain Rock and Lewis Land Management. Leatzow testified that she did not attend the Rule 2004 examination with the Defendants[13]. Richard testified at the 2004 examination that the Schedules and Statements were true and accurate.

Plaintiffs filed their complaint in this adversary proceeding on March 9, 2007, objecting

_____

[13]Melissa responded to Cossitt's questions at the 2004 examination why Leatzow was not representing them: "We can't afford it." Ex. 1, pp. 74-75.

to Defendants' discharge under § 727(a)(4) for fraud, material omissions and false oaths in Counts I and II, and seeking exceptions from their discharge for embezzlement under 11 U.S.C. § 523(a)(4) (Count III) and willful and malicious injury under § 523(a)(6) for embezzlement and conversion of assets (Count IV).  By stipulation the parties agreed to bifurcate and hold trial on Counts I and II on September 27, 2007.

At trial Plaintiffs objected to and moved to strike Richard's answers that he relied on advice of counsel because it was not pleaded as an affirmative defense in their answer and Leatzow asserted the attorney-client privilege, and Cossitt made an offer of proof in support. Defendants' counsel replied that they pleaded their attorney's advice in their answer at paragraph 10, and the Rule 2004 examination put Plaintiffs on notice of Defendants' contention that they relied on advice of counsel regarding the corporate entities.  The Court noted that Cossitt elicited the "advice of counsel" testimony on several occasions at trial before he moved to strike, but agreed that the defense was not pleaded as an affirmative defense.  The Court granted Plaintiffs' motion to strike for Defendants' failure to plead attorney advice as an affirmative defense, which had a prejudicial effect on Plaintiffs' discovery, and ordered Richard's testimony relying on the advice of counsel stricken.  But the Court noted that the Defendants' bankruptcy documents are outside of the attorney-client privilege, and Plaintiffs still have the burden of proving Defendants knowingly and fraudulently made false oaths.

## CONTENTIONS

The approved Final Pretrial Order set forth with specificity the allegations of Counts I and II.  Count I alleges that Defendants failed to disclose their interests in and status as officers of the corporations Lewis Land Management, Inc., and Rocky Mountain Rock in their Schedules and

21

SOFA.  Count II alleges that Defendants failed to disclose that Rocky Mountain Rock was a codebtor with the Defendants with respect to several scheduled debts in their Schedules, 341 meeting testimony and at the 2004 examination.  Plaintiffs contend that Defendants' omissions constitute fraud, material omissions and false oaths.

Defendants contend that Plaintiffs failed to satisfy their burden of proof to show that Defendants knowingly and fraudulently made a material false oath or account, and that they are entitled to a discharge because the omitted businesses were defunct and without value, the Plaintiffs and creditors were aware of those interests, and the omissions did not detrimentally affect the administration of the case since the Trustee did not join in the adversary proceeding. Defendants argue that they included information regarding the omitted corporations in their petition and SOFA, including names and tax ID numbers.  They contend that they did not knowingly and fraudulently omit Rocky Mountain Rock as a codebtor in their Schedules, that some of the credit was incurred before their incorporation by the Defendants individually, and that the omission was not material because the corporations were defunct and without value.

Plaintiffs argue that Defendants' discharge should be barred because they made numerous false oaths at their Rule 2004 examination and concealed interests in Rocky Mountain Rock and Lewis Land Management, Inc., in their Schedules, their § 341(a) meeting testimony and at their Rule 2004 examination, that they concealed that Rocky Mountain Rock was a codebtor of numerous creditors, and that Rocky Mountain Rock is an omitted creditor[14] based on the draws

---

[14]This last contention is outside the specific elements of liability set forth in Part V of the approved Final Pretrial Order.  The Court at trial indicated that it would not consider evidence involving omission of Defendants' income because Plaintiffs failed to give Defendants adequate notice of those allegations in the Final Pretrial Order.  Plaintiffs are not unfairly prejudiced by this ruling, because the contentions regarding the Defendants draws from Rocky Mountain Rock

Defendants took from Rocky Mountain Rock as loans.  Plaintiffs contend that Debtors' actions made the interests lack value and that their concealment made it difficult for creditors to investigate.

Plaintiffs accuse Defendants of "ever shifting stories" in their testimony and that they "engaged in a carefully orchestrated attempt to not disclose the true state of their financial affairs."  Plaintiffs argue that Defendants' failure to amend their Schedule B and SOFA to correct the omissions failed to fulfill their duty to correct inaccuracy or incompleteness.  Plaintiffs contend that Defendants' false oaths were material, even though the assets had no value or could be claimed as exempt, if they bear a relationship to the Debtors' business transactions or estate, and do not depend on whether they were detrimental to creditors.

Plaintiffs argue that Defendants' failure to disclose approximately $15,000 in receipts from Lewis Land Management within a year prior to the petition date was a material omission and misrepresented their income status and Form 22 obligation[15], and that Rocky Mountain Rock had significant value because Defendants took large sums from it while running its business and operated the corporations shortly before filing their bankruptcy petition.  Plaintiffs argue that Defendants' omissions and false oaths left false impressions and undermined Plaintiffs' ability and that of the Trustee and U.S. Trustee to make informed determinations.  Plaintiffs contend that Defendants exhibited an overall pattern of reckless or cavalier disregard for the accuracy of their Schedules and Statements, which gives rise to an inference of fraudulent intent established

---

remain at issue in this adversary proceeding under Count III (11 U.S.C. § 523(a)(4) embezzlement) and Count IV (§ 523(a)(6) willful and malicious embezzlement or conversion).

[15]This contention too is outside the scope of the Final Pretrial Order, as discussed above at page 6, n.5, and at trial.

by "badges of fraud" discussed in *Abbey v. Retz*[16].  Plaintiffs request entry of judgment denying

Defendants' discharge for numerous false oaths.

## DISCUSSION

Pursuant to Order entered on August 22, 2007 (Docket No. 26) trial of this adversary

proceeding on September 27, 2007, was bifurcated and limited to Counts I and II of Plaintiffs'

complaint objecting to Defendants' discharge under 11 U.S.C. § 727(a)(4)(A).  "A claim for

denial of discharge under § 727 is construed liberally and in favor of the discharge and strictly

against a person objecting to the discharge."  *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876,

882 (9th Cir. BAP 2005) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342

(9th Cir. 1986).  The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the

"honest but unfortunate debtor".  *Marrama v. Citizens Bank of Mass.*, __ U.S. __, 127 S.Ct.

1105, 1107, 166 L.Ed.2d 956 (2007).  The "fresh start" is explained by the Ninth Circuit

Bankruptcy Appellate Panel in *Albarran v. New Forms, Inc. (In re Albarran)*, 347 B.R. 369, 379

(9th Cir. BAP 2006):

> The general policy of bankruptcy law favors allowing an honest debtor to
> discharge debts and to make a fresh start free from the burden of past
> indebtedness. *See Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d
> 124 (1970). Thus, because a debtor in bankruptcy is assumed to be poor but
> honest, there is a presumption that all debts are dischargeable unless a party who
> contends otherwise proves, with competent evidence, an exception to discharge.
> *See Brown v. Felsen*, 442 U.S. 127, 128-29, 99 S.Ct. 2205, 60 L.Ed.2d 767
> (1979); Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL ¶ 301.60, p.

---

[16]The parties cite this Court's decisions in *Abbey v. Retz (In re Retz)*, 364 B.R. 742
(Bankr. D. Mont. 2007) (denying summary judgment) and *Olympic Coast Investment, Inc., v.
Wright (In re Wright)*, 364 B.R. 51 (Bankr. D. Mont. 2007).  Both of those cases are currently on
appeal as of the date of this decision and are not final, and so will not be relied on by the Court
for its decision herein, except that the Court will note similarities and distinctions in the facts
where appropriate.

870 (2006 ed.).

The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Grogan v. Garner*, in further explaining the "fresh start" policy of the Bankruptcy Code, states that "a central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)." 498 U.S. 279, 286, 111 S.Ct. 654, 659 112 L.Ed.2d 755 (1991). The party seeking to deny the debtor's discharge bears the burden of proof, which under § 727 is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 289; *In re Searles*, 317 B.R. 368, 376 (9th Cir. BAP 2004), *aff'd.*, 212 Fed.Appx. 589 (9th Cir. 2006).

In addition the Court notes and deems it significant that the Trustee in Debtors' Chapter 7 case, Samson, although he appeared (under subpoena) and testified in Plaintiffs' case-in-chief, did not join in or express support for Plaintiffs' claims for denial of Defendants' discharge for false oaths. Instead, Samson described this as a relatively nondescript case, and that while it makes administration of a case more difficult when debtors fail to mark the "codebtor" box indicating corporate debt, Samson specified that in the instant case, after examination of the Debtors he found no red flags, no reason to perform additional investigation and no assets or value for the defunct corporations. Unlike in the *Abbey v. Retz* case, in the instant case Samson did not file an adversary proceeding to deny Defendants' discharge, and instead filed a no asset report asking that the case be close. *See also Wright*, 364 B.R. at 79-80 (Trustee Samson absent

25

as a party seeking denial of discharge).

### § 727(a)(4)(A) – False Oaths.

This Court construed § 727(a)(4)(A) in *Torgenrud v. Schmitz (In re Schmitz)*, 224 B.R.

149, 150-51, 17 Mont. B.R. 43, 44-46 (Bankr. D. Mont. 1999):

> The Bankruptcy Code provides that a debtor under Chapter 7 shall be granted a
> discharge, unless "the debtor knowingly and fraudulently, in or in connection with
> the case--(A) made a false oath or account...." 11 U.S.C. S 727(a)(4). Thus, to
> succeed on a § 727(a)(4)(A) claim, the objecting party must demonstrate that: (1)
> a false oath or statement was made by the debtor; (2) knowingly and fraudulently;
> (3) which was material to the course of the bankruptcy proceedings. *First Nat'l
> Bank of Crosby v. Syrtveit (In re Syrtveit)*, 105 B.R. 596 (Bankr. Mont. 1989). A
> false oath or statement is made when it occurs (1) in the debtor's schedules or (2)
> at an examination during the course of the proceedings. *Scimeca v. Umanoff*, 169
> B.R. 536, 542 (D.N.J.1993); *aff'd*, 30 F.3d 1488 (3d Cir.1994). The Court in
> *Scimeca* noted that while the initial burden lies on the objector to prove that the
> debtor made a false statement in connection with the proceedings, once it
> "reasonably appears the oath is false, the burden falls on the bankrupt" to disprove
> the allegation. *Scimeca*, 169 B.R. at 542; *Kramer v. Poland (In re Poland)*, 222
> B.R. 374 (Bankr. M.D.Fla 1998) ("it is well established that once the Plaintiff has
> met the initial burden by producing evidence which establishes a basis for the
> objection, the Defendant has the ultimate burden of persuasion. *See, Chalik v.
> Morrefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir. 1984).").

> * * * *

> With regard to materiality, the Eighth Circuit Court of Appeals adopted the
> following standard of materiality as espoused by the Eleventh Circuit Court of
> Appeals in *Chalik*, 916 F.2d at 484:

>> The subject matter of a false oath is 'material,' and thus sufficient to bar
>> discharge, if it bears a relationship to the bankrupt's business
>> transactions or estate, or concerns the discovery of assets, business
>> dealings, or the existence and disposition of his property.

> *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992). . . . This case highlights an
> obvious and fundamental maxim in bankruptcy–that providing false information
> under oath in a bankruptcy proceeding is not a matter to be taken lightly. *See e.g.,
> Tully*, 818 F.2d 106, 112 (1st. Cir. 1987) (stressing that sworn statements in
> bankruptcy schedules "must be regarded as serious business" because "the system

will collapse if debtors are not forthcoming");  *In re Nazarian*, 18 B.R. 143, 146 (Bankr. D.Md.1982) (noting that a creditor need not actually rely on the false statement).  As previously noted by this Court,

> The primary purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so they can rely upon it without the need for the Trustee or other interested parties to dig out the true facts through examinations or investigations.

*Bastrom*, 106 B.R. at 227.

*See also Mabank Bank v. Grisham (In re Grisham)*, 245 B.R. 65, 76 (Bankr. N.D. Tex. 2000).

This Court discussed a debtor's responsibility in completing schedules and statements of financial affairs in *Torgenrud v. Wolcott (In re Wolcott)*, 194 B.R. 477, 486 (Bankr. D. Mont. 1996):

> As to the false declarations in Wolcott's Schedules and Statement of Affairs, the preparation and filing of such documents for the Bankruptcy Court "is no idle task." *Torgenrud v. Smith* (*In re Smith* ), 14 Mont.B.R. 228, 232 (Bankr. D. Mont.1995). Courts take a very dim view of the " 'intentional and fraudulent omission of property from sworn schedules [which] amounts to an offense punishable by the Criminal Code.' " *In re Woodson*, 839 F.2d 610, 614 (9th Cir.1988). "Numerous cases hold that the debtor has a duty to prepare schedules carefully, completely and accurately." *In re Mohring*, 142 B.R. 389, 394 (Bankr.E.D.Cal.1992), *aff'd mem.*, 153 B.R. 601 (9th Cir. BAP 1993), *aff'd mem.*, 24 F.3d 247 (9th Cir.1994). Moreover, a debtor must correct such documents filed with a court upon learning of their inaccuracy or incompleteness. *Id.* The debtor has "no discretion in this regard." *Smith*, 14 Mont.B.R. at 233. Furthermore, a debtor has an affirmative duty to "cooperate with the trustee in preparing a 'complete inventory of the property of the debtor.' " *Mohring*, 142 B.R. at 394. Failure to follow these precepts results in denial of a debtor's general discharge for harboring an intent to conceal property. 11 U.S.C. § 727(a)(2); *Devers*, 759 F.2d at 753-754.

> In the case *sub judice*, Wolcott's actions fly in the face of the foregoing dictates. The Court identified at least six flat falsehoods contained in Wolcott's Schedules and Statements of Affairs. Furthermore, in written arguments filed with the Court, Wolcott boldly admitted to concealing from the Trustee a $45,000 asset. These flagrant violations of Wolcott's clear duty of honesty and forthrightness in the conduct of Wolcott's bankruptcy clearly demonstrate a calculated intent to

conceal property. Thus, once again, even construing the evidence against Wolcott in the most lenient light, the Court finds 11 U.S.C. § 727(a)(2) altogether satisfied.

The above-quoted language demonstrates the overlap between the subsections of § 727, and was included in this Court's decision in *Wright*, 364 B.R. at 71-73.

All that is required for a denial of discharge under the plain language of § 727(a)(4)(A) is a single false oath or account. *Wright*, 364 B.R. at 73; *Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 277 (1st Cir. BAP 1999) (*citing Schmitz*). "A false oath may involve a false statement or omission in the debtor's schedules." *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999); *Searles*, 317 B.R. at 377, citing *Wills*; *Wright*, 364 B.R. at 73.

Applying this standard to the record in the instant case, the Court finds that several false statements or omissions exist in the Defendants' Schedules, satisfying the first requirement under *Schmitz*, with respect to both Counts I and II. Under Count I the omissions contended are Defendants' failure to list their ownership interests in Lewis Land Management, Inc., and Rocky Mountain Rock on Schedule B, paragraph 13 and their SOFA. The Court agrees that the omissions of the interests in the two corporations from Schedule B, paragraph 13, were omissions under § 727(a)(4)(A). Leatzow's opinion that they did not need to be disclosed on Schedule B, paragraph 13 because there were no stock certificates and no value to the defunct corporations is no excuse for the omission. Neither corporation was dissolved as of the petition date and the interests were required to be disclosed. The listing of the corporations' names and tax ID numbers on the petition does not excuse their omission from Schedule B.

The Court further agrees that the failure to separately list the sole proprietorship Lewis

28

Land Management and Lewis Land Management, Inc., at Question 18 of the SOFA is an omission under § 727(a)(4)(A), as they were separate entities.  However, the Court disagrees with Plaintiffs on Count I that Debtors' failure to list their status as officers of the corporations was an omission.  The language of Question 18 of the SOFA includes a list of the debtor's status as officer, director, or managing executive but does not require that debtors list their specific status, and thus the Court does not consider Defendants' failure to list their status at Question 18 an omission under § 727(a)(4)(A).

Turning to Count II the Court agrees that Defendants' failure to mark the debts for which Rocky Mountain Rock was a codebtor as such on Schedule F, and their omission of Rocky Mountain Rock from Schedule H as a codebtor, were omissions under § 727(a)(4)(A) as the corporation was not dissolved and should have been listed regardless of Leatzow's opinion that it was defunct and valueless.  However, the Court does not agree with Plaintiffs' contention that Richard was guilty of "ever shifting stories" at the § 341 meeting or Rule 2004 examination regarding his liability for Rocky Mountain Rock debt.  Plaintiffs argue that he answered some questions that the debts were Rocky Mountain Rock debts, and other times answered that the same debts were his.  The simple answer is that they were jointly liable for the debts, and Richard's evident confusion in his testimony reflects nothing more than his inability to express that concept, not false oaths.

The earliest evidence in the record that Defendants were personally liable for the Rocky Mountain Rock debts is from Plaintiffs' attorney Ferrington, in Ex. C sent to Defendants several months before the petition date, in which he declared "you have personal liability for the debts of the corporation".  The inclusion of the jointly owed corporate debts on Schedule F was not a

29

false statement because of Defendants' personal liability asserted by Plaintiffs in Ex. C, but the

codebtor should have been noted on Schedule F and listed on Schedule H the appropriate

information, and the debts should have been listed as contingent or disputed as appropriate.

Having established false statements or omissions in both Counts I and II, Plaintiffs still have the

burden of proof to show that they were material and were made knowingly and fraudulently.

Materiality may be established if an omission of a business interest "bears a relationship

to the bankrupt's business transactions or estate, or concerns the discovery of assets, business

dealings, or the existence and disposition of the debtor's property". *Retz*, 364 B.R. at 758-59

(denying summary judgment), quoting *Wills*, 243 B.R. at 62. The above analysis in *Schmitz*

remains good law consistent with the BAP's analysis of §727(a)(4) in *Searles* and *Wills*, 243

B.R. at 62-63, in which the BAP sets forth a comprehensive analysis of intent and materiality

thus:

> Materiality is broadly defined. A false statement is material if it bears a
> relationship to the debtor's business transactions or estate, or concerns the
> discovery of assets, business dealings, or the existence and disposition of the
> debtor's property. *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984). See also *In
> re Weiner*, 208 B.R. 69, 72 (9th Cir. BAP 1997), rev'd on other grounds, 161 F.3d
> 1216 (9th Cir.1998) (citing *Chalik* and holding that a false statement is material if
> it "bears a relationship to the debtor's estate, and concerns the discovery of assets,
> or the existence and disposition of his property").
>
> A false statement or omission may be material even if it does not cause direct
> financial prejudice to creditors. See *Weiner*, 208 B.R. at 72; *Chalik*, 748 F.2d at
> 618. *See also In re Hoblitzell*, 223 B.R. 211, 215-16 (Bankr.E.D.Cal.1998)
> (omission of asset may be material even if it did not financially prejudice the
> estate or creditors "if it aids in understanding the debtor's financial affairs and
> transactions"); [*In re Ford*, 159 B.R. 590, 593 (Bankr. D. Or. 1993)] (omission or
> false statement may be material if it is relevant to the discovery of past
> transactions--value of omitted assets does not have to be significant to be material
> and no detriment to creditors need be shown); *In re Haverland*, 150 B.R. 768, 771
> (Bankr.S.D.Cal.1993) (applying standard set forth in *Chalik* and noting that

materiality of false oath does not depend on whether the falsehood is detrimental to creditors).

The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations. [*In re Aubrey*, 111 B.R. 268, 274 (9th Cir. BAP 1990)]. "[T]he opportunity to obtain a fresh start is . . . conditioned upon truthful disclosure." *Id.* "The entire thrust of an objection to discharge because of a false oath or account is to prevent knowing fraud or perjury in the bankruptcy case. As a result, the objection should not apply to minor errors or deviations in testimony under oath." William L. Norton, Jr., NORTON BANKRUPTCY LAW AND PRACTICE 2D § 74.11 (1997). A false statement or omission that has no impact on a bankruptcy case is not grounds for denial of a discharge under § 727(a)(4)(A). 6 Lawrence P. King *et al.*, COLLIER ON BANKRUPTCY ¶ 727.04[1][b] (15th ed. Rev. 1998)(citing *In re Fischer*, 4 B.R. 517 (Bankr.S.D.Fla.1980)). As a result, omissions or misstatements relating to assets having little or no value may be considered immaterial. *See, e.g., In re Waddle*, 29 B.R. 100 (Bankr. W.D. Ky. 1983). Likewise, omissions or misstatements concerning property that would not be property of the estate may not meet the materiality requirement of § 727(a)(4)(A). *See, e.g., In re Swanson*, 36 B.R. 99 (9th Cir. BAP 1984). However, an omission or misstatement relating to an asset that is of little value or that would not be property of the estate is material if the omission or misstatement detrimentally affects administration of the estate.

> In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors. Even if the debtor can show that the assets were of little value or that a full and truthful answer would not have directly increased the estate assets, a discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealing and financial condition. Similarly, if the omission interferes with the possibility of a preference or fraudulent conveyance action the omission may be considered material.

6 King, COLLIER ON BANKRUPTCY ¶ 727.04[1][b].

In this case, the bankruptcy court determined that the false statements and omissions in Debtors' petition were not material solely because Fogal did not show that the assets had sufficient value to increase the amount paid to creditors. Based on the above authorities, we conclude that a statement or omission relating to an asset that is of little value or that would not be property of the estate can be material if it detrimentally affects the administration of the estate. The

bankruptcy court applied an incorrect interpretation of the materiality requirement of § 727(a)(4)(A).   We therefore remand so that the court can apply the correct legal standard.

   b. Intent

To deny a debtor a discharge under § 727(a)(4)(A), the plaintiff must show that the debtor knowingly and fraudulently made a false oath. *Aubrey*, 111 B.R. at 274. Intent must be actual, not constructive.  *In re Devers*, 759 F.2d 751, 753 (9th Cir.1985).

*See Wright*, 364 B.R. at 73-74.

Turning first to whether the false statements and omissions are material, the Court concludes that Plaintiffs failed their burden.  While the Defendants' ownership interests in Rocky Mountain Rock and Lewis Land Management, Inc., were omitted from Schedule B and the latter combined with Lewis Land Management at Question 18 of the SOFA, both were listed at Question 18 and on the petition together with their Tax ID numbers.  The corporate debts of Rocky Mountain Rock were not listed as codebtor debts on Schedule F or Schedule H, but Rocky Mountain Rock is a party-Plaintiff with Patrick, and Patrick's attorney Ferrington is the first person shown by the record to have declared Defendants' personally liable for the Rocky Mountain Rock corporate debts.

Plaintiffs subpoenaed the Trustee Samson to testify, but he provided no testimony in support of their contention that the omissions alleged in Count I with respect to the interests in corporations detrimentally affected the Trustee's investigation or administration of the estate. Since the interests were disclosed elsewhere and Defendants cooperated with Samson's investigation which he concluded and filed a no asset report, based upon *Wills* the Court deems the Count I omissions as immaterial and of no impact on the bankruptcy case.  243 B.R. at 62-63;

32

*Wright*, 364 B.R. at 74, quoting *Wills* (other citations omitted).

With respect to both Counts I and II Plaintiffs contend that the false statements and omissions detrimentally affected their investigation, but no evidence exists in the record to support that contention. Rocky Mountain Rock is a Plaintiff and the other Plaintiff Patrick did not testify, nor did Plaintiffs call any other witness to testify on the subject of their investigation or that it was detrimentally affected by the Defendants' omissions and false statements. Samson and the Defendants had no knowledge nor was their competence to testify regarding Plaintiffs' investigation established. Patrick's attorney Ferrington declared Defendants personally liable for the Rocky Mountain Rock corporate debts months before the Schedules and SOFA were filed, in Ex. C. Plaintiffs' contention that the omissions and false statements alleged in Count I and II under the Final Pretrial Order detrimentally affected their investigation is unsupported by any evidence, and is attorney argument. Attorney argument is not admissible in evidence and therefore not relevant. *Hurley v. Student Loan Acquisition Auth. of Ariz., et al.*, (*In re Hurley*), 258 B.R. 15, 23 (Bankr. Mont. 2001) (An attorney's argument is not evidence); *United States v. Velarde-Gomez*, 224 F.3d 1062, 1073 (9th Cir. 2000); *Exeter Bancorporation v. Kemper Securities Group, Inc.*, 58 F.3d 1306, 1312 n.5 (8th Cir. 1995) (Statements of counsel are not evidence and do not create issues of fact), citing *United States v. Fetlow*, 21 F.3d 243, 248 (8th Cir. 1994), *cert. denied*, 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 365 (1994); *In re Nielsen*, 211 B.R. 19, 22 n.3 (8th Cir. BAP 1997) (Neither statements of counsel nor exhibits to a brief are evidence unless expressly stipulated as admissible evidence).

Samson did testify, with respect to the joint corporate debts alleged under Count II, that failure to list corporate debts as joint debts on individual schedules detrimentally affects his

administration of an estate.  As a general rule that may be so, but Samson did not join in or voice

any support for Plaintiffs' § 727(a)(4)(A) objections to discharge, and Samson did not provide

any specific testimony detailing how the Defendants' failure to list the corporate debts as joint

debts in the instant Chapter 7 bankruptcy case detrimentally affected his administration of this

estate.  As stated above Plaintiffs offered only attorney argument and no evidence.  Therefore, as

the Court is bound to construe § 727(a)(4)(A) liberally in favor of discharge and strictly against

the person objecting to discharge, the Court concludes that Plaintiffs failed to satisfy their burden

to show that the Defendants' omissions and false statements alleged and established under Count

II, as well as Count I, are material.  *Roberts v. Erhard*, 331 B.R. at 882; *Adeeb*, 787 F.2d at 1342.

A plaintiff must show that the debtor knowingly and fraudulently made a false oath.  A

court may consider the fact that an asset has little value in its determination of a debtor's intent

under § 727(a)(4).  *Wills*, 243 B.R. at 64; *Wright*, 364 B.R. at 75.  As in *Wright*, the corporate

interests omitted from Schedule B were in defunct corporations, in which the Plaintiffs failed to

establish had any value, and the Trustee has not joined the action to deny Plaintiffs' discharge.

364 B.R. at 75.

The requisite fraudulent intent "must be actual, not constructive".  *Wills* 243 B.R. at 64

(citing *Devers*, 759 F.2d at 753).  Plaintiffs may prove such intent through "circumstantial

evidence or by inferences drawn from" the Defendants' course of conduct."  *Id*. (citing *Devers*,

759 F.2d at 753-54).  Surrounding circumstances and certain badges of fraud may establish the

necessary intent.  *Wills*, 243 B.R. at 64, citing *See In re Woodfield,* 978 F.2d 516, 518-19 (9th

Cir.1992).  Although *Woodfield* involves 11 U.S.C. § 727(a)(2), the analysis of intent applicable

to such section applies also to 11 U.S.C. § 727(a)(4).  6 Collier on Bankruptcy, ¶

727.04[1][a] (15th ed. rev.).  "A court may find the requisite intent where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth."  *Wills*, 243 B.R. at 64 (citing *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564 (Bankr. S.D.Cal. 1996)).

The second term "knowingly" requires Defendants to act deliberately and consciously. *Roberts*, 331 B.R. at 883.  The following analysis from *Roberts* is instructive:

> The bankruptcy court did not make a finding that Roberts acted deliberately and consciously in failing to make these disclosures until he amended his Statement. Instead, the court found that Roberts exhibited, "a careless and reckless approach to the important duty of disclosure in sworn bankruptcy filings." "Careless and reckless" is a lower standard than "knowing."
>
> An action is careless if it is "engaged in without reasonable care." *Id.* at 225. This is a negligence standard, not a knowing misconduct standard. A false statement resulting from ignorance or carelessness does not rise to the level of "knowing and fraudulent." *See, e.g., Mondore v. Mondore (In re Mondore),* 326 B.R. 214, 217 (Bankr.W.D.N.Y.2005) ("a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent").
>
> Similarly, recklessness does not measure up to the statutory requirement of "knowing" misconduct. An action is reckless if it creates, "a substantial and unjustifiable risk of harm to others [through] a conscious (and sometimes deliberate) disregard for or indifference to that risk ...." BLACK'S LAW DICTIONARY at 1298.  Since the bankruptcy court did not find that Roberts made his nondisclosures "knowingly" in the required sense, we cannot sustain the denial of his discharge.

*Roberts*, 331 B.R. at 884.  The Court notes however that "[a] reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge."  *Wright*, 364 B.R. at 76, quoting 6 COLLIER ON BANKRUPTCY, ¶ 727.04[1][a] (15th ed. rev.).  The elements of "knowingly" and "fraudulently" may not be conflated.  They each must be proven.  *See Roberts,* 331 B.R. at 885.

A debtor's bankruptcy schedules must be verified or contain an unsworn declaration under penalty of perjury.  28 U.S.C. § 1746; F.R.B.P. Rule 1008; *Searles*, 317 B.R. at 377. Accordingly, a false statement or omission in a debtor's schedules or statement of financial affairs qualifies as a false oath under § 727(a)(4)(A).  *Kavanagh v. Leija (In re Leija)*, 270 B.R. 497, 502-03 (Bankr. E.D. Cal. 2001).  The Defendants signed their Schedules with a declaration under penalty of perjury which states in part, "that they are true and correct to the best of my knowledge, information, and belief."  The declaration at the end of the SOFA does not include the clause "to the best of my knowledge, information, and belief", but the Court nevertheless considers Defendants' personal characteristics after observing them testify at trial under oath with respect to both declarations.

Plaintiffs contend that Defendants "engaged in a carefully orchestrated attempt to not disclose the true state of their financial affairs."  Based on the evidence in the record and observation of the Defendants at trial, the Court concludes frankly that they are not up to such a task.

No evidence exists regarding the Defendants' education, and no evidence exists that they have the training, experience, acumen, or ability to engaged in a "carefully orchestrated attempt" to not disclose the true state of their financial affairs.  One would expect such a "carefully orchestrated attempt" to not disclose corporate interests to include, at the very least, omitting names and Tax ID numbers of corporations from the petition and SOFA Question 18 in addition to omitting them from Schedule B.  The evidence shows that Richard had nothing to do with the record keeping of their businesses, instead leaving that to Melissa.  Melissa tried, but admitted that she does not understand Quickbooks, and that she failed her attempt to incorporate Lewis

36

Land Management and left it to her accountant.  The Plaintiffs' exhibits show Debtors

responding to their attorney's requests for additional information, as well as the Trustee's.  Ex. 9,

10, 11, 14, and 16.  These are honest, unfortunate and unsophisticated Debtors.  The evidence

reflects ignorance and perhaps carelessness by the Defendants, but the Court finds that it does not

rise to the level of knowing and fraudulent, or even recklessness.  *Roberts*, 331 at 883-84;

*Wright*, 364 B.R. at 73-74.

Plaintiffs next contend that Debtors failed their continuing duty to formally amend their

incorrect Schedules and SOFA, as required under *Mohring*, 142 B.R. at 394.  Amendment of

schedules is liberally allowed under F.R.B.P. 1009(a).  *Martinson v. Michael (In re Michael)*,

163 F.3d 526, 529, 17 Mont. B.R. 192, 198 (9th Cir. 1998).  It is true that the Defendants have not

amended their Schedules and SOFA to correct the false statements and omissions, as the debtors

did in *Wright*, 364 B.R. at 76, and as the debtor in *Retz* failed to do.  Given the fact that

Defendants filed an unrelated amendment to Schedule F, their failure to amend their Schedules to

correct the errors and omissions is puzzling, and exposed them to the risk of denial of their

discharge under § 727(a)(4)(A)[17].  However, given the Trustee's absence in joining Plaintiffs'

action, and Plaintiffs' failure to satisfy their burden of showing that the false statements and

omissions were material or made knowingly and fraudulently, Defendants' failure to amend does

not suffice to deny their discharge under § 727(a)(4)(A).

---

[17] No reason is given in the record for Debtors' failure to make corrective amendments to
their Schedules and SOFA.  The only suggestion was Melissa's Rule 2004 examination
testimony why Leatzow was not representing them:  "We can't afford it."  Ex. 1, pp. 74-75.
Having accepted a fee from the Debtors to represent them in their bankruptcy, if the reason
Debtors' counsel failed to file amended Schedules and SOFA correcting their false statements
and omissions is because they could not afford to pay her additional fees, that would reflect
poorly on counsel and be of grave concern to the Court.

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b).

2.  Counts I and II of Plaintiffs' complaint objecting to Defendants' discharge are core proceedings under 28 U.S.C. § 157(b)(2)(J).

3.  Plaintiffs failed to satisfy their burden under 11 U.S.C. § 727(a)(4)(A) of showing that Defendants knowingly and fraudulently, in or in connection with the above-captioned Chapter 7 case, made material false oaths or omissions as alleged in Counts I and II.

**IT IS ORDERED** a separate Judgment on Counts I and II shall be entered at the conclusion of this adversary proceeding in favor of the Defendants/Debtors Richard Paul Lewis and Melissa Lewis, in conformity with the above, dismissing Counts I and II of the complaint filed in this adversary proceeding; and a separate Order shall be entered fixing a date and time for a scheduling conference trial of the remaining Counts III and IV of the complaint.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana